*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NEW COVERT GENERATING COMPANY, LLC,

      Petitioner-Appellee/Cross-Appellant,

v

TOWNSHIP OF COVERT,

      Respondent-Appellant/Cross-Appellee,

and

COUNTY OF VAN BUREN,

      Intervening Respondent-Appellant/Cross-Appellee.

FOR PUBLICATION
September 24, 2020
9:05 a.m.

No. 348720
Tax Tribunal
LC No. 16-001888-TT

---

NEW COVERT GENERATING COMPANY, LLC,

      Petitioner-Appellee,

v

TOWNSHIP OF COVERT,

      Respondent-Appellant,

and

COUNTY OF VAN BUREN,

      Intervening Respondent-Appellant.

No. 348721
Tax Tribunal
LC No. 12-000248-TT

---

Before: MURRAY, C.J., and CAVANAGH and SWARTZLE, JJ.

-1-

PER CURIAM.

This dispute involves the tax assessed on an electric power plant owned by petitioner, New Covert Generating Company. In Docket No. 348720, respondents, Covert Township and Van Buren County, appeal by right the Tax Tribunal's opinion and judgment setting the true cash value of the personal property at issue for tax year 2016, and the Tax Tribunal's order imposing sanctions for the filing of frivolous motions. On cross-appeal in Docket No. 348720, New Covert Generating appeals by right the Tax Tribunal's opinion and judgment setting the true cash value of the personal property for tax year 2016. In Docket No. 348721, the Township and County appeal by right the Tax Tribunal's orders imposing sanctions arising from motions filed in the dispute over tax years 2012 through 2015. We affirm.

## I. STATEMENT OF FACTS

The present appeal involves a long-running dispute between New Covert Generating and the local taxing authorities regarding the proper assessed value of New Covert Generating's industrial personal property and the proper application of any tax exemptions applicable to the property. New Covert Generating owns real property in Covert Township, which is in Van Buren County. The property has been improved with a natural gas-fired combined-cycle facility and related equipment. Such power plants have two kinds of turbines: combustion turbines and steam turbines. A generator converts the rotational energy of the turbines into electricity. New Covert Generating is not a utility—it is a merchant generator of electricity that sells electricity on the open market. New Covert Generating transitioned from selling in the Midcontinent Independent System Operator (MISO) market to the PJM Interconnection (PJM) by June 2016, to increase profits and work at a higher capacity. New Covert Generating had to build a new switchyard, the Segreto switchyard, to make this transition.

## II. PROCEDURAL HISTORY

### A. CHALLENGES TO PROPERTY ASSESSMENTS

New Covert Generating has challenged the assessments of its real and personal property for the years 2010 through 2016. In December 2012, the Tax Commission granted New Covert Generating's classification appeal for the years 2010 and 2011, ordering the Township to create a separate personal property parcel for the turbines and generators, and classify that parcel as industrial personal property. The classification change entitled New Covert Generating to receive the state education tax and school operating millage exemptions to its personal property other than its turbine property. But in January 2013, New Covert Generating challenged the 2011 and 2012 assessments on the ground that the taxing authorities failed to take into consideration the state education tax and school operating millage exemptions for nonturbine personal property.

In May 2013, the Tax Tribunal issued its opinion setting the true cash value of the parcels for 2010 and 2011, and New Covert Generating petitioned the Tax Tribunal to require the taxing authorities to modify the assessed values for 2013 using the values established by the Tax Tribunal for 2011 with appropriate adjustments.

In February 2014, New Covert Generating filed a new petition with the Tax Tribunal regarding its 2011 tax assessments by the Township and County. New Covert Generating stated that the Township had assessed its real property at $193,970,800 and its personal property at $6,552,240 for 2011. It noted that it had appealed to the Commission the Township's decision to classify its turbines, generators, and other machinery as real property. The Commission, it wrote, had since granted the appeal, and ordered the Township to create a separate personal property parcel for the turbines and generators. It also ordered the Township to classify the property as industrial personal property. New Covert Generating alleged that the County thereafter issued a new tax bill for 2011 that reallocated most of the value previously classified as real property to the new personal property parcel created for the turbine personal property, which was not entitled to tax exemptions. The new assessments provided:

| Parcel Number | Tax Year | Actual Value/State Equalized Value | Taxable Value |
|---|---|---|---|
| 80-07-004-003-03 Real Property | 2011 | $8,016,600 | $8,016,600 |
| 80-07-900-084-00 Personal Property | 2011 | $6,663,600 | $6,663,600 |
| 80-07-900-084-01 Turbine Property | 2011 | $185,842,800 | $185,842,800 |

New Covert Generating alleged that the County lacked the authority to make the changes and stated that, after the change, the Commission modified its order and required the Township to assess the "turbines" alone under the new parcel—parcel 80-07-900-084-01—and to move the other personal property from the real property parcel to the original personal property parcel number, which was parcel 80-07-900-084-00. New Covert Generating alleged that the actions by the Township and County did not constitute a final decision, ruling, or determination not already subject to the Tax Tribunal's jurisdiction, but it nevertheless stated that it was appealing the reclassification in its petition as a precautionary measure.

This Court issued an opinion affirming the Tax Tribunal's decision regarding the assessments for 2010 and 2011. See *New Covert Generating Co v Covert Twp*, unpublished per curiam opinion of the Court of Appeals, issued August 4, 2015 (Docket No. 320877). In that decision we recognized that the Township had initially taxed two separate parcels owned by New Covert Generating: one tax parcel for its industrial personal property and another for its real property. See *id*. at 1. However, we recognized that the Commission ordered the Township to establish a separate tax parcel for New Covert Generating's industrial personal property that constituted turbines beginning with the 2011 tax year. *Id*. at 1 n 1. The Court related that the Commission ordered the Township to create the separate parcel because turbines were not exempt property. *Id*. at 12-13. The case proceeded to trial before the Tax Tribunal, and the Tax Tribunal ultimately set the true cash value of the property at $179,100,000 for 2010, and at $228,400,000 for 2011. *Id*. at 2.

The Township also argued in part that the Tax Tribunal did not have jurisdiction to consider New Covert Generating's petition because New Covert Generating did not file statements of assessable property in 2010 and 2011. *Id*. This Court concluded that, under MCL 205.735a, New Covert Generating properly invoked the Tax Tribunal's jurisdiction without filing the statements,

explaining that the statutory requirement that the petitioner file a statement of assessable property applied only to appeals in which the petitioner appealed directly to the Tax Tribunal without first protesting the assessment before the Board. *Id*. at 4. Because New Covert Generating had filed a protest before the Board for the 2011 assessment, it could properly appeal that assessment to the Tax Tribunal without filing a statement of assessable property. *Id*. at 5. Although New Covert Generating did not protest the 2010 assessment to the Board, this Court concluded that New Covert Generating complied with the requirement that it file a statement of assessable property by filing the Commission's Form 4175. *Id*. For these reasons, the Court concluded that the Tax Tribunal had jurisdiction to consider the dispute. *Id*. at 5.

This Court also reviewed the Township's challenges to the Tax Tribunal's findings and determined that the Tax Tribunal did not make any errors that warranted relief. *Id*. at 6-8. Finally, this Court declined to interpret the meaning of the term "turbine" because the tax exemption at issue did not become effective until December 31, 2011. *Id*. at 13. As such, it did not apply to the tax years at issue. *Id*.

In May 2016, New Covert Generating filed a petition challenging the assessments of its property for 2016. The Tax Tribunal thereafter consolidated all of the appeals involving tax claims for years 2012 through 2015 into one appeal, and ultimately granted the County's motion to intervene.

## B. MOTIONS FOR SUMMARY DISPOSITION

In February 2017, New Covert Generating moved for partial summary disposition in the consolidated appeals and the appeal involving the 2016 tax year, asking the Tax Tribunal to interpret the meaning of the term "turbine" as used in MCL 211.903(3)(b) and MCL 380.1211(10)(e)(*ii*), which excluded "turbines" from the industrial personal property that was otherwise exempt from the state education tax and the school operating millage. New Covert Generating stated that the Township had taken the position that the term applied to turbines and all of the machinery attached to the turbine that was needed to generate electricity. New Covert Generating argued that the term properly applied to a single machine—a rotor with vines or blades—and it asked the Tax Tribunal to declare that that was the proper understanding of the term.

To determine the proper interpretation of the term "turbine," the Tax Tribunal found it noteworthy that the Legislature had demonstrated its ability to identify energy systems involving turbines in other statutes, but chose not to define the term to include an energy system in the statutes at issue. Thus, the Tax Tribunal rejected the Township's contention that the term applied broadly "to include all parts necessary to generate electricity." Relying on a dictionary definition, the Tax Tribunal held that the term "turbine," as used in MCL 211.903 and MCL 380.1211, referred to a single piece of equipment: a rotary engine activated by the reaction or impulse or both of a current of fluid such as water, steam, or air. Thus, the trial court granted partial summary disposition to New Covert Generating Company.

Assertedly on the basis of several discovery disputes, the Township and County moved for summary disposition on October 25, 2017. They argued that New Covert Generating did not have standing to challenge the assessments because it was not a "party in interest" as that phrase is used

-4-

in MCL 205.735a(6), as the evidence showed that it was allegedly a "shell entity," as it had no employees, did not possess any records, and did not operate any businesses. New Covert Generating had claimed that it had no ability to respond to discovery, but the entities that actually operated the plant claimed that they did not have to respond to discovery requests because the Tax Tribunal had no jurisdiction over them. The Township and County filed a second motion for summary disposition in November 2017, asserting that New Covert Generating was uncollectible and had no standing.

The Tax Tribunal denied that motion for summary disposition, stating that it was undisputed that New Covert Generating owned the property at issue. As such, it was a party in interest as defined in *Spartan Stores, Inc v Grand Rapids*, 307 Mich App 565; 861 NW2d 347 (2014). The Tax Tribunal also concluded that the Township and County violated MCR 2.114— now MCR 1.109(E)—by submitting a motion that was not grounded in fact or law because the Township and County ignored the holding in *Spartan Stores* and improperly attempted to distinguish it. Accordingly, the Tax Tribunal awarded New Covert Generating costs and fees.

New Covert Generating submitted a bill of costs and fees in the amount of approximately $26,000. After the Township and County objected, the Tax Tribunal held an evidentiary hearing on the reasonableness of New Covert Generating's bill of costs, but withheld its decision until entry of its final order and judgment resolving the appeals.

In June 2018, the Township and County again moved for summary disposition on the ground that the Tax Tribunal lacked jurisdiction. They argued that the Commission requires electric generating facilities to file three different statements of assessable property, and although New Covert Generating filed the three forms, the filings were improper because two of the forms were filed under protest, and inserted $0 as the value of the property, which was inaccurate. Additionally, under MCL 205.735a(4)(b), they argued that New Covert Generating could not invoke the Tax Tribunal's jurisdiction without filing accurate statements of assessable property, which it did not do.

New Covert Generating responded that the motion was patently frivolous, as the Township and the County had asserted the same argument in the 2010 and 2011 proceedings, and both the Tax Tribunal and this Court rejected that argument. It was undisputed that New Covert Generating had filed the required forms for each of the years at issue and, it had protested to the Board for each of the years except 2013. New Covert Generating asserted that the Township and County knew that their motion was meritless, and requested sanctions.

In July 2018, the Tax Tribunal denied the outstanding motions for summary disposition by the Township and County. The Tax Tribunal rejected the Township and County's argument that it had to order New Covert Generating to pay its taxes before it could consider New Covert Generating's appeals. It also recognized that this Court had already rejected the contention that the Tax Tribunal lacked jurisdiction because New Covert Generating failed to file the properly filled-out forms. The Tax Tribunal further opined that the timing and nature of the motion raised concerns that the Township and County made it for an improper purpose, or knew that it was frivolous. However, the Tax Tribunal held that issue in abeyance pending resolution of the underlying tax disputes.

## C. THE CONTESTED HEARING

In July 2018, the Tax Tribunal held a contested hearing to determine the true cash value and taxable values of the parcels at issue in the appeal for the 2016 tax year.[1] Edward VanderVries and Laureen Birdsall testified regarding the 2016 assessment of New Covert Generating's property—$660 million, but they allocated 3% of that total to real property, which left a value of $638 million for the personal property.

The managing director of Duff & Phelps, hired by New Covert Generating to appraise the plant, testified that there was enough data to support the use of all three valuation approaches for New Covert Generating's plant: income, cost, and sales. On the basis of these three approaches, New Covert Generating's property was worth $408 million. The Township and County presented their rebuttal case before presenting testimony and evidence concerning their valuation of New Covert Generating's plant. Their experts reviewed the Duff & Phelps appraisal, and felt that there were several errors and inaccuracies in each of the three valuation approaches.

## D. POSTHEARING JUDGMENTS

In January 2019, the parties entered a stipulated judgment establishing the true cash values, assessed values, and taxable values for all of the parcels involved in the tax appeals for tax years 2012 through 2015. They also stipulated to the amount of refund owing to New Covert Generating for those tax years. The Tax Tribunal entered the stipulated judgment as a partial consent judgment. The Tax Tribunal left the appeal open to consider the costs and fees to be awarded as a sanction.

The Tax Tribunal subsequently issued its February 8, 2019 final opinion and judgment establishing the true cash value and taxable values for the parcels at issue in the appeal for the 2016 tax year. The Tax Tribunal found that the parties' experts agreed that the assessor's value ($1,342,800) for the land was accurate, as was the value of the exempt pollution control assets ($46,320,249). The Tax Tribunal found that the assessment presented by the Township and County was not supported by substantial, competent, or material evidence, and that while New Covert Generating's appraisal was not without its flaws, it did constitute substantial, competent, and material evidence sufficient to clear the low hurdle of the burden going forward with the evidence. For that reason, the Tax Tribunal rejected the Township and County's request for a directed verdict.

Turning to the parties' appraisals, the Tax Tribunal generally found that the appraisal by Duff & Phelps (New Covert Generating's expert) was more reliable than the appraisal by Concentric (the appraiser for the Township and County). The Tax Tribunal agreed that the sales approach employed by Duff & Phelps was flawed, but accepted the cost approach as a reliable approach in valuing the property. The Tax Tribunal explained that the only alternative to purchasing an existing plant would be to purchase a new plant. In looking at the cost approach,

---

[1] New Covert Generating's parent company sold New Covert Generating along with other holding companies to another entity in 2015. The transfer constituted an uncapping event, which led to the revaluation of the property as of December 31, 2015. See MCL 211.27a(3).

the Tax Tribunal found that Duff & Phelps's use of the 2016 Annual Energy Outlook report was relevant to determining the cost of a new plant on December 31, 2015. The Tax Tribunal found that the costs associated with the construction of a new plant stated in the 2016 Annual Energy Outlook report included the cost of a switchyard; as such, it agreed with Duff & Phelps's conclusion that the cost of a switchyard had to be deducted when determining the replacement cost.

The Tax Tribunal did agree with two criticisms of Duff & Phelps's cost approach. It determined that it was reasonable to include owner's profit in the cost to build a new plant. The Tax Tribunal also did not agree with Duff & Phelps's decision to deduct the cost of the Segreto switchyard with regard to each of its valuation approaches. On the basis of these changes, the Tax Tribunal revised the cost value calculated by Duff & Phelps from $423,000,000 to $510,000,000.

The Tax Tribunal next discussed Duff & Phelps's income approach. It found that Duff & Phelps's capacity factor of 65% was more accurate than Concentric's capacity factor of 87%. The Tax Tribunal accepted Duff & Phelps's use of the capital asset pricing model when calculating the discount rate, but did not agree that it was inappropriate for Duff & Phelps to subtract the value of New Covert Generating's intangibles at an estimated 3%. According to the Tax Tribunal, Duff & Phelps should not have deducted the costs associated with the Segreto switchyard when determining value using the income approach. For that reason, the Tax Tribunal added $59 million back to the value to reach a modified value of $509,000,000 for the income approach.

In the end, the Tax Tribunal concluded by weighing the two approaches equally and finding that the true cash value of all the property was $509,500,000. The Tax Tribunal then turned to the proper allocation of the value.

The Tax Tribunal employed Duff & Phelps's method for determining the value of the real property, which was to subtract the agreed value of the land, multiply the remainder by 3% to calculate the value of the improved land, and then add the land value back to that total to get a real estate value of $16,587,516. The total value of the personal property would then be $492,912,484. After determining the value of the personal property, the Tax Tribunal subtracted the agreed value of the tax-exempt pollution control property, which was $31,960,972. The remaining value of the personal property was $460,951,512.

The Tax Tribunal did not agree with Duff & Phelps's allocation of the remaining value between the turbine personal property parcel and the nonturbine personal property parcel. The Tax Tribunal determined that the law required it to value the turbine property as installed. It determined that 46% of the value ought to be assigned to the turbine parcel, which resulted in a value of $212,037,696 for that parcel.

At the same time it entered its final opinion and judgment for the 2016 tax year, the Tax Tribunal entered its order awarding costs and fees as a sanction for the Township and County's motions for summary disposition in the appeals involving the 2012 through 2015 tax years. The Tax Tribunal found that the litigation conduct of the County's counsel called into question whether the motions were interposed for an improper purpose. Specifically, the Township and County filed six motions for summary disposition and a request for immediate consideration, and despite counsel being familiar with *Spartan Stores*, he argued in direct contravention of its holding. The

Tax Tribunal concluded that the Township and County had attempted to cast New Covert Generating in a bad light.

The Tax Tribunal similarly found that the June 2018 motion was frivolous, reasoning that that motion was completely unfounded and made for an improper purpose because it was identical to motions previously filed and resolved, and those parties failed to acknowledge that the issue had been decided previously by the Tax Tribunal and this Court. Their failure to cite to the previous opinion led the Tax Tribunal to conclude that the motion was frivolous and imposed for an improper purpose.

The Tax Tribunal found that $17,955 of the fees that New Covert Generating requested for responding to the motion of October 2017 were reasonable. It ordered the signatory of that motion to pay half the fees. The Tax Tribunal ordered a hearing to determine what fees would be reasonable for the filing of the June 2018 motion. After the hearings, the Tax Tribunal entered an order for sanctions arising from the June 2018 motion, rejecting the Township and County's request for a hearing, and instead granted relief on its earlier findings after a hearing to set the hourly rate. It then considered the bill of costs and dramatically reduced it because it felt that the hours billed were unreasonable given that the basis for the motion had been previously rejected. The Tax Tribunal found that $5,580 of the fees were reasonable. It ordered that 50% be attributed to each docket, and ordered the signatories to the motion to jointly pay the sanction.[2]

### III. INVOKING THE TAX TRIBUNAL'S JURISDICTION

The Tax Tribunal did not commit an error of law when it concluded that it had jurisdiction over the appeals.

This Court's review of agency decisions involving property tax valuations is quite limited: "In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation." Const 1963, art 6, § 28. Because these claims of error involve whether the Tax Tribunal properly interpreted and applied the statutes governing its jurisdiction, this Court's review is limited to determining whether the Tax Tribunal committed an error of law in its interpretation and application of the statutes. *Mich Props, LLC v Meridian Twp*, 491 Mich 518, 527-528; 817 NW2d 548 (2012). This Court reviews de novo whether the Tax Tribunal erred as a matter of law when interpreting and applying statutes. *Makowski v Governor*, 317 Mich App 434, 441; 894 NW2d 753 (2016). Agency interpretations of a statute are entitled to "respectful consideration, but they are not binding on courts and cannot conflict with the plain meaning of the statute." *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 117-118; 754 NW2d 259 (2008).

---

[2]The Tax Tribunal also entered an order granting New Covert Generating's motion to correct errata. It corrected the values attributed to the personal property parcels, and corrected a misstatement in the opinion. This order resolved the last pending claim and closed the appeal for the 2016 tax year, but it noted that it still had to resolve the outstanding motions for reconsideration.

Whether a tribunal had subject-matter jurisdiction may be raised at any time, even for the first time on appeal. See *Midwest Energy Co-op v Mich Pub Serv Comm*, 268 Mich App 521, 523; 708 NW2d 147 (2005). This Court also reviews de novo as a question of law whether this Court has subject-matter jurisdiction. *Id*.; *Chen v Wayne State Univ*, 284 Mich App 172, 191; 771 NW2d 820 (2009).

## A.  APPELLATE JURISDICTION

As a preliminary matter, we note that part of the appeal in Docket No. 348721 was previously dismissed with regard to the claims involving the March 11, 2019 order. This Court ordered that the appeal involving the order of February 8, 2019, remained pending. See *New Covert Generating Co, LLC v Covert Twp*, unpublished order of the Court of Appeals, entered May 14, 2019 (Docket No. 348721). What has not been decided is whether this Court lacked jurisdiction to consider whether statements of assessable property must be filed to invoke jurisdiction or whether New Covert Generating was a party in interest because the Township and County did not timely appeal the consent judgment. We do so now.

This Court's jurisdiction to hear an appeal of right is determined by application of the court rules. See *Chen*, 284 Mich App at 192. This Court generally has jurisdiction of an appeal of right from a final judgment or order, of the circuit court or of the court of claims, as defined under MCR 7.202(6). See MCR 7.203(A)(1). This Court also has jurisdiction to hear appeals of right from a "judgment or order of a court or tribunal from which appeal of right to the Court of Appeals has been established by law or court rule." MCR 7.203(A)(2). The Legislature provided that the Tax Tribunal is "the final agency for the administration of property tax laws." MCL 205.753(1). And it further provided that a party has an appeal by right in this Court from a "final order or decision of the tribunal," which "may be taken by filing an appeal in accordance with the Michigan court rules after the entry of the order or decision appealed from or after denial of a motion for rehearing timely filed." MCL 205.753(2). Accordingly, an aggrieved party must file a claim of appeal within 21 days of the entry of a final judgment or order. See MCR 7.203(A)(2); MCR 7.204(A)(1)(a).

Because the consent judgment disposed of all the claims and adjudicated all the rights and liabilities of all the parties for the disputes involving tax years 2012 through 2015, it was a final judgment as to those petitions. See MCR 7.202(6)(a)(*i*). We have jurisdiction to consider the first two issues raised in Docket No. 348721 to the extent that those claims involve the Tax Tribunal's authority to enter the order compelling the payment of attorney fees because the Township and County timely appealed that order. To the extent that the Township and County have impliedly challenged the consent judgment by arguing that the Tax Tribunal should not have denied their motions for summary disposition, this Court treats it as if on leave granted. See, e.g., *Schultz v Auto-Owners Ins Co*, 212 Mich App 199, 200 n 1; 536 NW2d 784 (1995).

New Covert Generating also argues that this Court cannot consider any challenge to the consent judgment because a party may not assert an error with regard to a judgment to which that party consented. See *Dora v Lesinski*, 351 Mich 579, 582; 88 NW2d 592 (1958). However, a party may raise a challenge to subject-matter jurisdiction at any time, and the parties cannot confer subject-matter jurisdiction on the Tax Tribunal by their conduct or through waiver. See, e.g.,

*Paulson v Secretary of State*, 154 Mich App 626, 630-631; 398 NW2d 477 (1986).[3] Accordingly, the Township and County may challenge the Tax Tribunal's exercise of subject-matter jurisdiction even though they did not reserve the right to appeal on that ground in the consent judgment. *Id*.

## B. INVOKING THE TAX TRIBUNAL'S JURISDICTION

The Township and County argue that under MCL 205.735a(4)(b), which applies to disputes involving industrial personal property, the filing of a properly completed statement of assessable property is always a prerequisite to invoking the Tax Tribunal's jurisdiction—whether as a direct appeal or as an appeal after protest to the Board. They assert that MCL 205.735a(4)(b) requires this result because the conditional clause at the end of the first sentence in subdivision (4)(b) applies equally to a protest before the Board and a direct appeal to the Tax Tribunal. Moreover, they argue that the failure to comply with that condition deprives the Tax Tribunal of subject-matter jurisdiction and, for that reason, the prerequisites cannot be waived or forfeited.

### 1. SUBJECT-MATTER JURISDICTION OR PROCEDURAL PREREQUISITE

Subject-matter jurisdiction involves a court or tribunal's abstract power to try a case of the kind or character of the one pending. *Petersen Fin, LLC v Kentwood*, 326 Mich App 433, 441; 928 NW2d 245 (2018). The Legislature provided for the Tax Tribunal's subject-matter jurisdiction under MCL 205.731. *Hillsdale Co Senior Servs, Inc v Hillsdale Co*, 494 Mich 46, 52-53; 832 NW2d 728 (2013). That statute provides that the Tax Tribunal "has exclusive and original jurisdiction over all of the following:"

> (a) A proceeding for direct review of a final decision, finding, ruling, determination, or order of an agency relating to assessment, valuation, rates, special assessments, allocation, or equalization, under the property tax laws of this state.

> (b) A proceeding for a refund or redetermination of a tax levied under the property tax laws of this state.

> (c) Mediation of a proceeding described in subdivision (a) or (b) before the tribunal.

> (d) Certification of a mediator in a tax dispute described in subdivision (c).

> (e) Any other proceeding provided by law. [MCL 205.731.]

MCL 205.731 does not limit the Tax Tribunal's jurisdiction on the basis of prerequisites to the assertion of jurisdiction. The prerequisites to the assertion of jurisdiction appear under MCL 205.735 for appeals commenced before January 1, 2007, and under MCL 205.735a for appeals commenced after December 31, 2006. Courts have long recognized that not all prerequisites to

---

[3] This Court is not required to follow the rule of law established by an opinion of this Court published before November 1, 1990. See MCR 7.215(J)(1). However, under traditional principles of stare decisis, pre-1990 decisions continue to have precedential effect. MCR 7.215(C)(2).

the assertion of jurisdiction reduce the subject-matter jurisdiction of a tribunal—some are merely claim-processing rules that do not implicate subject-matter jurisdiction. See *Union Pacific R Co v Brotherhood of Locomotive Engineers and Trainmen Gen Comm of Adjustment*, 558 US 67, 81-82; 130 S Ct 584; 175 L Ed 2d 428 (2009).

Although it did not directly consider whether the Legislature intended to make the prerequisites stated under MCL 205.735 jurisdictional, the Supreme Court has characterized them as jurisdictional. *Szymanski v Westland*, 420 Mich 301, 303-305; 362 NW2d 224 (1984). This Court has been inconsistent when interpreting whether the prerequisites to the Tax Tribunal's acquisition of jurisdiction stated under MCL 205.735 implicated subject-matter jurisdiction and, therefore, could not be waived or forfeited, or were merely procedural and could be waived or forfeited. Compare *Parkview Mem Assoc v Livonia*, 183 Mich App 116, 121; 454 NW2d 169 (1990) (holding that a failure to comply with a prerequisite under MCL 205.735, although stated in terms of the acquisition of jurisdiction, were merely procedural and did not constitute a limitation on subject-matter jurisdiction), with *Leahy v Orion Twp*, 269 Mich App 527, 532; 711 NW2d 438 (2006) (holding that a failure to comply with a prerequisite under MCL 205.735 deprived the Tax Tribunal of jurisdiction). The inconsistency has in part been the result of the Supreme Court's handling of these prerequisites. The *Parkview* Court relied in part on the Supreme Court's decision in *W & E Burnside, Inc v Bangor Twp*, 402 Mich 950*l*; 314 NW2d 196 (1978), where the Court reversed this Court's decision to affirm the Tax Tribunal's decision to dismiss for lack of jurisdiction on the ground that the taxpayer did not protest before the board as required under MCL 205.735(1). See *id.*; *W & E Burnside, Inc v Bangor Twp*, 77 Mich App 618, 624; 259 NW2d 160 (1977), rev'd 402 Mich 950*l* (1978). If the requirements stated under MCL 205.735 limited the Tax Tribunal's subject-matter jurisdiction, then the failure to comply with those requirements could not be waived. As such, the decision in *W & E Burnside* suggested that the Supreme Court viewed the prerequisites as jurisdictional only in the looser sense.

In any event, and as discussed below, the Tax Tribunal did not err when it concluded that New Covert Generating had met the requirements of MCL 205.735a(4)(b). Therefore, the Tax Tribunal had the authority to consider the appeal.

## 2. ACQUIRING JURISDICTION

The resolution of this issue involves the proper interpretation of MCL 205.735a(4)(b). The goal of statutory interpretation is to discern and give effect to the Legislature's intent. See *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999). The best indicator of the Legislature's intent is the language of the statute itself. *Id*. If the statute is unambiguous, this Court must assume that the Legislature intended the meaning clearly expressed and must enforce the statute as written. *Id*. Notably, a statute is not interpreted in a vacuum; rather, it must be interpreted in context and with a view to the statute's placement within the overall statutory scheme. *Manuel v Gill*, 481 Mich 637, 650; 753 NW2d 48 (2008).

As part of the General Property Tax Act, see MCL 211.1 *et seq.*, the Legislature created boards of review for townships and other municipalities, the primary function of which is to examine and review the accuracy of tax assessment rolls. MCL 211.29(1). The Legislature also required boards of review to meet for limited periods to hear taxpayer protests of an assessment. MCL 211.30(4). Normally, a board must afford an opportunity to be heard to any person who has

-11-

appeared before the board to protest an assessment. MCL 211.30(3). But a Township may require a taxpayer to first properly raise his or her claim to the assessor or another agency as a prerequisite to filing a protest before the board. MCL 211.107(1); *AERC of Mich, LLC v Grand Rapids*, 266 Mich App 717, 722-723; 702 NW2d 692 (2005). The statutory provisions most directly addressing a board's authority do not otherwise impose any prerequisites that must be met before a person may file a protest with the board.

The Legislature also created the Tax Tribunal through the Tax Tribunal Act, MCL 205.701 *et seq.* See MCL 205.721. The Tax Tribunal is a quasi-judicial agency, MCL 205.721(1), that has exclusive jurisdiction "for direct review of a final decision, finding, ruling, determination, or order of an agency relating to assessment, valuation, rates, special assessments, allocation, or equalization, under the property tax laws of this state." MCL 205.731(a). An agency is defined to include boards of review. See MCL 205.703(a). Accordingly, the Legislature provided the Tax Tribunal with the general authority to hear appeals from final decisions by boards of review.

Before January 1, 2007, the Tax Tribunal could only acquire jurisdiction over a tax dispute involving an assessment or exemption if the aggrieved party first protested the assessment or claimed the exemption before the appropriate board of review, see MCL 205.735(2), which was consistent with the Legislature's conferral of jurisdiction to hear appeals from final decisions and orders. Although the Legislature generally continued to require petitioners to first protest to the appropriate board of review for disputes arising after December 31, 2006, see MCL 205.735a(3), the Legislature provided taxpayers with the option to appeal directly to the Tax Tribunal without protesting to the board under certain circumstances:

> (4) In the 2007 tax year and each tax year after 2007, all of the following apply:
>
> (a) For an assessment dispute as to the valuation or exemption of property classified . . . as commercial real property, industrial real property, or developmental real property, the assessment may be protested before the board of review or appealed directly to the tribunal without protest before the board of review as provided in subsection (6).
>
> (b) For an assessment dispute as to the valuation or exemption of property classified . . . as commercial personal property, industrial personal property, or utility personal property, the assessment may be protested before the board of review or appealed directly to the tribunal without protest before the board of review as provided in subsection (6), if a statement of assessable property is filed under [MCL 211.19], prior to the commencement of the board of review for the tax year involved.
>
> (c) For an assessment dispute as to the valuation of property that is subject to taxation under . . . the commercial redevelopment act, . . . the enterprise zone act, . . . the technology park development act, . . . the obsolete property rehabilitation act, . . . the commercial rehabilitation act, . . . the assessment may be protested before the board of review or appealed directly to the tribunal without protest before the board of review as provided in subsection (6). This subdivision

-12-

does not apply to property that is subject to the neighborhood enterprise zone act . . . . [MCL 205.735a(4).]

Notably, the provisions of MCL 205.735a(4) are not framed as limitations on the acquisition of jurisdiction. Rather, they are framed as exceptions to the general prerequisite to the Tax Tribunal's acquisition of jurisdiction over a tax dispute as provided under MCL 205.735a(3). For tax disputes commenced after December 31, 2006, the Legislature reaffirmed that, except as otherwise provided under MCL 205.735a or other law, "for an assessment dispute as to the valuation or exemption of property, the assessment must be protested before the board of review" before the Tax Tribunal could acquire jurisdiction of the dispute as provided under MCL 205.735a(6). See MCL 205.735a(3).

Under MCL 205.735a(4), the permissive "may" was used to establish exceptions to the mandatory prerequisite to the acquisition of jurisdiction under MCL 205.735a(3). *Walters v Nadell*, 481 Mich 377, 383; 751 NW 2d 431 (2008) (the term "may" ordinarily is permissive, not mandatory). The Legislature provided that, for certain qualifying assessment and exemption disputes, the assessment or exemption "may be protested before the board of review or appealed directly to the tribunal without protest before the board of review." See MCL 205.735a(4)(a) and (c). The disjunctive "or" established that a taxpayer "may" do either of two things; the taxpayer "may" protest the assessment "before the board of review" or the taxpayer "may" appeal directly to the Tax Tribunal without protest before the board of review. In the former case, the Tax Tribunal would not acquire jurisdiction until after the taxpayer completed the protest and filed a petition in compliance with MCL 205.735a(6). In the latter case, the taxpayer could appeal directly to the Tax Tribunal by filing a petition in compliance with MCL 205.735a(6), notwithstanding the requirement stated under MCL 205.735a(3). Nothing within the statutory scheme suggests that the taxpayer who elects the first option might not subsequently appeal to the Tax Tribunal. The Legislature's statement that the assessment may be protested to the board or appealed directly to the Tax Tribunal *without protest to the board* demonstrates that the direct appeal is an exception to, not a replacement of, the requirement stated under MCL 205.735a(3). See MCL 205.735a(4)(a) and (c).

The only distinction between subdivisions (4)(a) and (c), and the exception stated in subdivision (4)(b), is that, for the exception stated under subdivision (4)(b), the Legislature added a limitation to the permissive language:

> For an assessment dispute as to the valuation or exemption of . . . commercial personal property, industrial personal property, or utility personal property, the assessment may be protested before the board of review or appealed directly to the tribunal without protest before the board of review as provided in subsection (6), if a statement of assessable property is filed . . . . [MCL 205.735a(4)(b).]

If the Township and County's preferred interpretation were correct, the exception stated under MCL 205.735a(4)(b) would necessarily apply to both options; that is, it would have to be understood to read that "the assessment may be protested before the board of review," "if a statement of assessable property is filed" before the commencement of the board of review, or the assessment may be "appealed directly to the tribunal without protest before the board of review,"

-13-

"if a statement of assessable property is filed" before the commencement of the board of review. Under that interpretation, the statute would in effect impose a prerequisite on the taxpayer's ability to protest *to the board of review*.

But subdivision (4)(b) does not address the authority of boards of review to hear a protest; it addresses the prerequisites applicable to the Tax Tribunal's acquisition of jurisdiction under an exception to the rule stated in MCL 205.735a(3). Tellingly, MCL 205.735a(3) already provides that the Tax Tribunal acquires jurisdiction to hear appeals that have first been protested to the board of review without imposing any such requirement. That is, if a petitioner first protested to the board of review, the Tax Tribunal would subsequently acquire jurisdiction under MCL 205.735a(3) without any need to resort to any of the permissive exceptions provided under MCL 205.735a(4). Therefore, given the statutory scheme as a whole and interpreting the statute in context, the condition applies to the last antecedent of the two antecedents separated by the disjunctive "or"—namely, it applies only in those appeals in which the taxpayer has directly appealed without making a protest to the board of review. See *Kales v Oak Park*, 315 Mich 266, 271; 23 NW2d 658 (1946) (stating that a modifying clause is confined to the last antecedent unless there is something in the subject matter or dominant purpose that requires a different construction).

In the previous appeal, this Court rejected the Township's construction of MCL 205.735a(4) because that construction, in effect, read a limitation into MCL 205.735a(3) that did not exist:

> MCL 205.735a provides a general jurisdictional rule in § (3) that provides that an assessment dispute must be protested before the board of review prior to the Tax Tribunal acquiring jurisdiction in accordance with the petition filing requirements of subsection (6). MCL 205.735a provides exceptions to the general rule, however, in subsection (4). Each subsection restates the general jurisdictional rule, but makes the general rule permissive rather than mandatory. Thus, while protest before board of review is not required for property covered in each of the three subsections prior to an appeal before the Tax Tribunal, protest before the board of review remains an available course. Respondent's proposed reading of the exception in subsection (4)(b) would add a requirement to the exception that does not exist in the general rule in section (3); that is, section (3) requires only that a petitioner protest an assessment before the board of review and does not require the filing of a statement of assessable personal property in order to allow the tribunal to acquire jurisdiction of the dispute under MCR 205.735a(6) upon the timely filing of a petition. Subsection (4)(b) similarly permits a petitioner to protest an assessment before the board of review, but also offers a petitioner the option of appealing to the tribunal without protest if an additional condition is satisfied: a statement of assessable property must be filed under § 19 of the general property tax act before commencement of the board of review for the particular tax year. . . . [See *New Covert Generating Co*, unpub op at 4.]

When read in context and with a view to the role of the exceptions in the statutory scheme as a whole, see *Manuel*, 481 Mich at 650, MCL 205.735a(4)(b) is not equally susceptible to more than a single meaning. *Alvan Motor Freight, Inc v Dep't of Treasury*, 281 Mich App 35, 39-40;

761 NW2d 269 (2008).[4] Rather, the plain language shows that the Legislature intended the requirement that the taxpayer file a statement of assessable property to apply only in cases of a direct appeal. MCL 205.735a(4)(b) plainly authorizes, but does not require, a taxpayer to appeal directly to the Tax Tribunal if the taxpayer filed a statement of assessable property. In the alternative, the taxpayer may protest to the board and, if he or she does so, the taxpayer has satisfied the prerequisite to the Tax Tribunal's acquisition of jurisdiction stated under MCL 205.735a(3).

Here, it is undisputed that New Covert Generating protested the assessments and exemptions before the Board of Review for each petition. Consequently, the Tax Tribunal acquired jurisdiction of the appeals consistent with MCL 205.735a(3) after a timely petition under MCL 205.735a(6). For these reasons, the Tax Tribunal did not commit an error of law when it determined that it had acquired jurisdiction of the appeals. See *Mich Props*, 491 Mich at 527-528.[5]

## IV. "PARTY IN INTEREST"

The Tax Tribunal also did not commit an error of law or adopt wrong principles when it concluded that New Covert Generating was a party in interest capable of invoking its jurisdiction.[6]

This Court reviews the Tax Tribunal's judgment and orders for fraud, error of law, or the adoption of wrong principles, *Mich Props, LLC*, 491 Mich at 527-528, while we review de novo whether the Tax Tribunal erred as a matter of law when it interpreted or applied the relevant statutes. *Makowski*, 317 Mich App at 441. This Court also reviews de novo as a question of law whether the Tax Tribunal had subject-matter jurisdiction. *Midwest Energy*, 268 Mich App at 523.

The Legislature provided, in relevant part, that the jurisdiction of the Tax Tribunal "is invoked by a party in interest, as petitioner, filing a written petition . . . ." MCL 205.735a(6). In *Spartan Stores*, 307 Mich App at 566, the Court had to determine whether Spartan Stores, Inc., which indirectly owned Family Fare, LLC, was a party in interest sufficient to invoke the Tax Tribunal's jurisdiction over the assessment of property in which Family Fare held a leasehold

---

[4] The Township, County, and Amici suggest adoption of their alternate construction of the statute because that construction would encourage disclosures and support the laudable goals of uniformity of practice in the assessment of taxes. Whether those policies might be better served by precluding a taxpayer from asserting an appeal before the Tax Tribunal for those years when the taxpayer did not file a statement of assessable property, or filed a noncompliant statement, are policy arguments, which have no relevance when determining the proper construction of a statute. *Stabley v Huron-Clinton Metro Park Auth*, 228 Mich App 363, 370; 579 NW2d 374 (1998) (stating that this Court will not impose a policy-driven interpretation of a statute when the Legislature has already chosen among competing policy considerations).

[5] This resolves this issue on appeal, and therefore we need not address New Covert Generating's argument regarding collateral estoppel, or the Township and County's argument that the statements of assessable property filed by New Covert Generating did not satisfy the requirements of MCL 205.735a(4)(b).

[6] As noted above, to the extent that the Township and County's appeal in Docket No. 348721 was untimely, we treat the appeal as on leave granted. *Schultz*, 212 Mich App at 200 n 1.

-15-

interest. *Id*. at 566-567. It also had to determine whether Family Fare was a party in interest even though it did not own the underlying property. *Id*. at 566-567.

The *Spartan Stores* Court examined the methods by which an appeal typically proceeded to the Tax Tribunal, and noted that taxpayers previously had to protest an assessment before the local board of review before the taxpayer could proceed to the Tax Tribunal. *Id*. at 571, citing MCL 205.735(2). The Court recognized that MCL 211.30(4) authorized only those persons (or their agents) whose property had been assessed to protest before boards of review; that is, only the actual owner of the property assessed could protest to the board. See *id*. at 570. The interplay between these statutes, the Court related, generally made it unnecessary to define the scope of the phrase "party in interest":

> [H]istorically it was unnecessary for courts to define the use of "party in interest" in MCL 205.735(3) with any more specificity, because the term necessarily encompassed only those parties that had protested before the board of review—i.e., the property owner or its agent. MCL 211.30(4). In other words, the board of review's strict limit on which parties could contest property-tax assessments served as a screen on which parties could appeal those assessments to the Tax Tribunal, and necessarily limited the scope of the phrase "party in interest" in MCL 205.735(3) to property owners or their agents. [*Id*. at 571-572.][7]

The Court held that the phrase "party in interest" should not be limited to the actual owner of the property assessed, explaining that the phrase referred more broadly to any person who held *any* property interest in the property assessed. *Id*. at 575-576. The Court held that a leasehold interest was such a property interest: "Michigan courts have long held that leaseholds manifestly are 'interests,' in that they are 'part of a legal . . . claim to or right in property.' Most importantly, for the purposes of our case, 'the word "interest" as applied to land embraces and includes leasehold interests and rights derived therefrom . . . .' " *Id*. at 575 (citations omitted; ellipsis in original). Because Family Fare held a leasehold interest in the assessed property, the Court held that Family Fare was a party in interest within the meaning of MCL 205.735a(6), even though it did not own the underlying real property assessed. *Id*. at 577. The Court, however, rejected the contention that Spartan was a party in interest as the indirect owner of Family Fare, as Michigan courts respect the separate existence of artificial entities and, because Spartan was not the actual owner of the real property and did not enter into the lease agreement, it did not have a property interest in the assessed property. *Id*. at 577-578. For that reason, the Court concluded, Spartan was not a party in interest within the meaning of MCL 205.735a(6). *Id*. at 578.

Returning to our case, it is undisputed that New Covert Generating was the actual owner of the real and personal property that had been assessed. Therefore, it was plainly a party in interest under both the original understanding of that phrase and the broadened construction of that phrase

---

[7] The Court recognized that it had discussed the phrase "party in interest," as used under MCL 205.735, in *Jefferson Schs v Detroit Edison Co*, 154 Mich App 390; 397 NW2d 320 (1986), but it concluded that that decision did not provide any clarity to the proper understanding of the phrase because it discussed the phrase before there was a direct appeal to the Tax Tribunal without protest before the board. See *Spartan Stores*, 307 Mich App at 574 n 7.

given by the *Spartan Stores* Court. Contrary to the Township and County's assessment, the Court's discussion of the law applicable to disregarding the separate existence of entities did not indicate that such an ownership interest may be insufficient when there has been an abuse of the corporate form. See *Spartan Stores*, 307 Mich App at 577 n 13.

Instead, the *Spartan Stores* Court stated that it could not conclude that Spartan had an interest in the property because it had to respect Spartan's separate existence from Family Fare. *Id.* It did not suggest that Family Fare's status as a party in interest would be lost if Family Fare's separate existence were disregarded. *Id.* Similarly, here there had been no underlying action involving a request to disregard the separate existence of New Covert Generating from the entities that directly or indirectly own and control it. *Gallagher v Persha*, 315 Mich App 647, 654, 664-666; 891 NW2d 505 (2016) (stating that the equitable doctrine of piercing the corporate veil is a remedy that may be invoked in a separate action to redress an underlying wrong). As such, the Tax Tribunal did not commit an error of law when it respected New Covert Generating's separate existence, as it was required to do, see *Green v Ziegelman*, 310 Mich App 436, 450-451; 873 NW2d 794 (2015), and determined that New Covert Generating was a party in interest that had the right to invoke the Tax Tribunal's jurisdiction consistent with *Spartan Stores*, 307 Mich App at 575-577, and MCL 205.735a(6). New Covert Generating was the record owner of the property assessed and, therefore, was necessarily a party in interest within the meaning of MCL 205.735a(6).

We reject the Township and County's argument that it would be absurd to allow a so-called "shell" corporation to invoke the Tax Tribunal's jurisdiction. Although the undisputed evidence showed that New Covert Generating outsourced its operations and management to related entities, it was also undisputed that New Covert Generating actually owned the real and personal property at issue, which was worth hundreds of millions of dollars. Given the value of these properties, New Covert Generating had a powerful incentive to comply with the tax laws and to adhere to the Tax Tribunal's orders and judgments in order to protect its property from liens, foreclosure, or seizure. See MCL 211.40 (providing that the failure to pay taxes assessed on real and personal property creates a lien on the real and personal property by operation of law, and the liens take precedence over all other claims to the property) and MCL 211.47 (authorizing taxing authorities to seize and sell personal property for unpaid taxes and providing a cause of action against the entity assessed for unpaid taxes). And if New Covert Generating's owners abused New Covert Generating's separate existence and recognition of its separate existence would be inequitable, the Township and County could seek to have a circuit court disregard New Covert Generating's separate existence and enforce a judgment for unpaid taxes against the owners. See *Gallagher*, 315 Mich App at 664-666; *Green*, 310 Mich App at 450-451.

The Tax Tribunal additionally had the authority to penalize New Covert Generating for discovery violations occasioned by its failure or refusal to authorize or cause the entities with whom it contracts to provide relevant discovery, should the taxing authorities be unable to get the discovery directly from those contracting entities. See MCL 205.732(c) ("Granting other relief or issuing writs, orders, or directives that it deems necessary or appropriate in the process of disposition of a matter over which it may acquire jurisdiction."). Although the Township and County make much of New Covert Generating's purported discovery violations, which they argue prevented a fair hearing in the Tax Tribunal, they have not appealed any of the Tax Tribunal's

discovery orders. Accordingly, there is no basis for concluding that New Covert Generating committed discovery violations that prevented a fair hearing.

## V. PROPER CONSTRUCTION OF TERM "TURBINE"

We next turn to whether the Tax Tribunal committed an error of law when it gave the term "turbine" its ordinary meaning.

Before 2007, the Legislature imposed a state education tax on property classified as industrial personal property, see MCL 211.903(1), and allowed local taxing authorities to impose a school operating tax on industrial personal property of up to 18 mills, see MCL 380.1211(1). As part of a tax reform, the Legislature amended those statutes to exempt personal property classified as industrial property from both taxes. See 2007 PA 37 (amending MCL 380.1211(1), in relevant part, to include an exemption for industrial personal property) and 2007 PA 38 (adding Subsection (3) to MCL 211.903, which exempted industrial personal property from the state education tax). The Legislature amended the statutes to exclude turbine personal property from the exemptions otherwise applicable to industrial personal property. After the amendment, MCL 211.903 provided:

(3) For taxes levied after December 31, 2007, the following property is exempt from the tax levied under this act:

(a) Except as otherwise provided in subdivision (b), personal property classified under . . . MCL 211.34c, as industrial personal property.

(b) Beginning December 31, 2011, a turbine powered by gas, steam, nuclear energy, coal, or oil the primary purpose of which is the generation of electricity for sale is not eligible for the exemption under this subsection.

After its amendment, MCL 380.1211 provided, in relevant part:

(1) Except as otherwise provided in this section and [under MCL 380.1211(c)], the board of a school district shall levy not more than 18 mills for school operating purposes or the number of mills levied in 1993 for school operating purposes, whichever is less. A principal residence, qualified agricultural property, qualified forest property, supportive housing property, property occupied by a public school academy, and industrial personal property are exempt from the mills levied under this subsection except for the number of mills by which that exemption is reduced under this subsection. . . . .

* * *

(10) As used in this section:

* * *

(e) "Industrial personal property" means the following:

-18-

(*i*) Except as otherwise provided in subparagraph (*ii*), property classified as industrial personal property under . . . MCL 211.34c.

(*ii*) Beginning December 31, 2011, industrial personal property does not include a turbine powered by gas, steam, nuclear energy, coal, or oil the primary purpose of which is the generation of electricity for sale.

The definition of industrial personal property is quite broad; it includes: "[a]ll machinery and equipment, furniture and fixtures, and dies on industrial parcels, and inventories not exempt by law." See MCL 211.34c(3)(c)(*i*). However, the Legislature chose to exclude turbines from the definition of industrial personal property, which in effect excluded turbines from the exemption from taxation for industrial personal property. Both of the exclusions to the exemption state that "industrial personal property," as defined under MCL 211.34c, does not include "a turbine powered by gas, steam, nuclear energy, coal, or oil the primary purpose of which is the generation of electricity for sale." See MCL 211.903(3)(b); MCL 380.1211(10)(e)(*ii*). The dispute on appeal involves the proper interpretation of the term "turbine" as used in these two statutes.

When interpreting a statute, this Court's goal is to determine the Legislature's intent. *Sun Valley Foods*, 460 Mich at 236. The best indicator of the Legislature's intent is the language of the statute itself. *Id*. If the statute is not ambiguous, this Court must assume that the Legislature intended the meaning clearly expressed and must enforce the statute as written. *Id*. A statute is ambiguous only when it irreconcilably conflicts with another provision or is equally susceptible to more than a single meaning. *Alvan Motor Freight*, 281 Mich App at 39-40. Notably, when construing a statute, this Court does not interpret the statute in a vacuum; rather, it must interpret the statute in context and with a view to the statute's placement within the overall statutory scheme. *Manuel*, 481 Mich at 650.

The Legislature did not define the word "turbine" under MCL 211.34c, MCL 211.903, or MCL 380.1211, or any related statute. And there is no basis for concluding that the term has acquired a technical meaning. As such, this Court must construe the term according to the common and approved usage of the language. MCL 8.3a; see also *Krohn v Home-Owners Ins Co*, 490 Mich 145, 156; 802 NW2d 281 (2011). The Tax Tribunal looked to a dictionary for evidence of the common usage for the term "turbine," which was proper. *Krohn*, 490 Mich at 156. A turbine is defined as "a rotary engine actuated by the reaction or impulse or both of a current of fluid (such as water, steam, or air) subject to pressure and [usually] made with a series of curved vanes on a central rotating spindle," *Merriam Webster's Collegiate Dictionary* (11th ed), or "[a]ny of various machines in which the kinetic energy of a moving fluid is converted to rotary mechanical power," *The American Heritage College Dictionary* (3d ed). Accordingly, reduced to its simplest terms, the ordinary meaning of the term "turbine" is a machine or engine that is rotated by moving fluids.

The Legislature further provided that only those turbines that were "powered by gas, steam, nuclear energy, coal, or oil the primary purpose of which is the generation of electricity for sale" were excluded from the exemption. MCL 211.903(3)(b); MCL 380.1211(10)(e)(*ii*). Contrary to the contention of the Township and County before the Tax Tribunal and on appeal, this qualifying language did not expand the ordinary meaning of the term "turbine." A turbine remained an engine or machine that was rotated by fluids. Read in context, it is beyond reasonable dispute that the Legislature added the qualifying clause to limit the exclusion to a particular class of turbines.

-19-

Given its common meaning, the term turbine applies to a wide variety of engines or machines that are rotated by moving fluids—everything from a waterwheel to a wind turbine. But the Legislature chose not to exclude waterwheels and wind turbines from classification as industrial personal property. Rather, it chose to limit the exclusion to those turbines that met two criteria: turbines that were (1) "powered" by "gas, steam, nuclear energy, coal, or oil," and (2) that have the primary purpose of "the generation of electricity for sale." Although the limiting language refers to the generation of electricity, the qualifying language cannot be understood to expand the ordinary understanding of the term "turbine" to encompass property that would be needed to enable the turbine to generate electricity. Applying the only reasonable construction, it is evident that the limiting language was intended only to limit the type of turbine that was excluded from the definition of industrial personal property—it was not intended to expand the types of property excluded from the definition of industrial personal property.

New Covert Generating urges a construction of the statute that goes beyond the plain meaning of the statute. New Covert Generating argues that the statutory language requires the Tax Tribunal to determine the value of the turbine as an isolated piece of equipment, and then subtract that value from the value of the industrial personal property as a whole.

As the Township and County correctly note, MCL 211.903 and MCL 380.1211 do not prescribe valuation methods. Rather, those statutes establish two things: that industrial personal property is exempt from the education taxes, and that a certain class of turbines are not industrial personal property. Those statutes, accordingly, only establish which industrial personal property was excluded from the exemption provided for industrial personal property. They do not establish the manner for calculating the taxable value of the property excluded from the exemption.

Additionally, New Covert Generating's construction ignores the fact that the statutes do provide that a turbine will not be excluded from the definition of industrial personal property unless "powered" by, in relevant part, gas or steam. The use of the past participle indicates that the turbines will only be excluded from the definition of industrial personal property when actually used in the manner described (i.e., when powered by gas or steam for the primary purpose of generating electricity for sale on the market). See MCL 211.903(3)(b); MCL 380.1211(10)(e)(*ii*). Therefore, the limiting language provides that only installed turbines of the class described are excluded from the exemption.

The conclusion that the turbines must be valued in relation to a functioning power plant also follows from the statutes governing the proper valuation of personal property. True cash value is defined as the "usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price that could be obtained for the property at private sale, and not at auction sale except as otherwise provided in this section, or at forced sale." MCL 211.27(1). And the testimony and evidence at trial established that the value of the plant as a whole was inherently linked to the value of the turbines within the plant's system for generating electricity.

Extensive testimony was put before the Tribunal establishing that the value of the plant depended almost entirely on the attributes and condition of the plant's turbines. The experts agreed that the expected lifespan and depreciation applicable to the turbines affected the value of the plant as a whole, and that the plant's capacity, efficiency (its heat rate), and its economic obsolescence

were related to its turbines and significantly affected the plant's value. There was also testimony that the long-term service plan for the turbines also affected the value of the plant. Therefore, the testimony and evidence established that persons who value and purchase power plants value the plant and its equipment as a whole, and do so in significant part on the basis of installed and functioning turbines. Consequently, the "usual selling price at the place where the property to which the term is applied," MCL 211.27(1), for a turbine that is "powered by gas, steam, nuclear energy, coal, or oil the primary purpose of which is the generation of electricity for sale," MCL 211.903(3)(b); MCL 380.1211(10)(e)(*ii*), is the price that a buyer would pay for the turbine as a functioning component part of a power plant.

New Covert Generating's argument that such a valuation indirectly causes the value of the turbine to include the value of ancillary equipment, in violation of the exclusions stated under MCL 211.903 and MCL 380.1211, is not well-taken. The statutes, when read in harmony, necessarily require the valuation of the turbine in relation to the value of a functioning whole— that is, the value of the turbine must be ascertained as part of the value of the plant that "powered" the turbine by "gas" or "steam" for the primary purpose of generating electricity for sale on the market because only turbines powered in this way are excluded from the definition of industrial personal property. See MCL 211.903(3)(b) and MCL 380.1211(10)(e)(*ii*). With New Covert Generating's preferred construction, the value of the turbines would have to be determined without reference to their value as a component of a functioning plant. That construction results in an overstatement of the value of the other industrial personal property of the plant, the value of which was valued as part of a functioning whole. Indeed, without a functioning turbine, the other property might have no value at all—the plant might, as one witness opined, be "shot." Likewise, that construction dramatically undervalues the turbines themselves because they are not valued as a functioning component part of a power plant, but as an isolated piece of equipment that had been used and was subject to depreciation and obsolescence. As the Township and County correctly observe, that construction essentially results in valuing the turbines as scrap and not according to the price that a seller would be willing to pay for the turbines as part of a functioning unit.

New Covert Generating also suggests that valuing the turbines as a component of a functioning plant runs afoul of the doctrine of uniformity in taxation, see Const 1963, art 9, § 3, because the value includes the costs of installation, which may vary from developer to developer. New Covert Generating's contention relies on a false premise. All other variables being the same, two turbines in two different plants would have the same value without regard to how much was paid to install them by the original developer. The value of the turbine as part of a functioning unit simply does not vary on the basis of the amount paid to install it. Rather, when proper valuation techniques are applied, the value of the turbine as a component of a functioning power plant will comply with the requirement of uniformity in taxation because similarly situated taxpayers will be assessed according to the value of the turbine as a component of a functioning whole. See *Armco Steel Corp v Dep't of Treasury*, 419 Mich 582, 592; 358 NW2d 839 (1984) (stating that the controlling principle is one of equal treatment for similarly situated taxpayers).

The Tax Tribunal did not commit an error of law when it interpreted the statutes to apply to a machine or engine rotated by fluid that was powered by—in relevant part—gas or steam and with a primary purpose of generating electricity. As such it did not commit an error of law when it concluded that the term did not apply to ancillary equipment necessary to enable the turbine to generate electricity. The Tax Tribunal also did not commit an error of law when it determined that

-21-

the value of the turbines at issue had to be ascertained by reference to their value as a component part of a functioning power plant. See *Mich Props*, 491 Mich at 527-528.

## VI. TAX TRIBUNAL'S FINDINGS AND DETERMINATIONS OF VALUE

As already noted, Michigan's Constitution limits this Court's ability to review "any [agency] decision relating to valuation or allocation" of taxes to review for "fraud, error of law or the adoption of wrong principles." Const 1963, art 6, § 28. An agency commits an error of law or adopts wrong principles when the agency's findings are not supported by competent, material, and substantial evidence on the whole record. See *Fisher-New Ctr Co v Mich State Tax Comm* (*On Rehearing*), 381 Mich 713, 715; 167 NW2d 263 (1969), and *Mich Props*, 491 Mich at 527-528.

The nature of the review required under the substantial-evidence test was articulated in *Mich Employment Relations Comm v Detroit Symphony Orchestra, Inc*, 393 Mich 116; 223 NW2d 283 (1974), where the Court explained that, although review was not de novo, it nevertheless must be thorough and required assessment of the evidence as a whole:

> What the drafters of the Constitution intended was a thorough judicial review of administrative decision, a review which considers the whole record—that is, both sides of the record—not just those portions of the record supporting the findings of the administrative agency. Although such a review does not attain the status of *de novo* review, it necessarily entails a degree of qualitative and quantitative evaluation of evidence considered by an agency. Such review must be undertaken with considerable sensitivity in order that the courts accord due deference to administrative expertise and not invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing views. Cognizant of these concerns, the courts must walk the tightrope of duty which requires judges to provide the prescribed meaningful review. [*Id*. at 124.]

This Court has characterized the substantial-evidence test as requiring evidence that a " 'reasoning mind' " would accept as sufficient to support a conclusion. See *Black v Dep't of Social Servs*, 195 Mich App 27, 30; 489 NW2d 493 (1992), citing *Soto v Director, Mich Dep't of Social Servs*, 73 Mich App 263, 271; 251 NW2d 292 (1977). Evidence that a reasoning mind would accept as sufficient is more than a scintilla, but less than a preponderance. See *Black*, 195 Mich App at 30. Further, it is not this Court's place to resolve conflicts in the evidence or pass on the credibility of witnesses—that is, if there was adequate evidence to support the agency's decision, then this Court cannot substitute its judgment for the agency's judgment. *Id*.

## A. REPLACEMENT COST: SWITCHYARD

The Township and County first argue that the Tax Tribunal should not have deducted the costs associated with the construction of a new switchyard from the base cost estimate for a new plant stated in the Energy Information Administration's 2016 Annual Energy Outlook report because there was insufficient evidence to support a $41 million deduction from the base cost.

It was undisputed that New Covert Generating's tax parcels did not include the switchyard for operation in the PJM market on the valuation date. In calculating the value of New Covert

Generating using the replacement cost method for valuation, the experts examined the estimated cost to build a state-of-the-art plant, and then adjusted the value of that plant to reflect the actual condition of the New Covert Generating plant. Both appraisers used the Energy Information Administration's Annual Energy Outlook reports to obtain a baseline estimated cost for a new plant. However, Duff & Phelps chose to use the 2016 Report, whereas Concentric chose to use the 2013 Report.

New Covert Generating's expert testified that the estimated cost for a new plant stated in the reports included the costs associated with the construction of a switchyard. Because New Covert Generating did not own a switchyard for its market, and the existing switchyard had no value to New Covert Generating, he opined that the cost included in the reports for a switchyard had to be deducted to reflect New Covert Generating's actual situation on the valuation date.

The record evidence reveals that the Tax Tribunal had to decide between two diametrically opposed positions: one stating that the Tax Tribunal should deduct $41 million to subtract out the costs associated with a new switchyard, and the other stating that the Tax Tribunal should make no adjustments to the baseline cost of a new plant to reflect the inclusion of equipment for a switchyard. Given the testimony supporting the conclusion that the Energy Information Administration's report included some costs associated with a switchyard or switchyard equipment, the Tax Tribunal cannot be faulted for concluding that the baseline cost stated in those reports had to be adjusted to subtract those costs. Similarly, one of New Covenant Generating's experts clarified how Duff & Phelps concluded that more than $41 million should be deducted from the baseline cost. His testimony, when considered with the exhibits underlying his opinion, was evidence that a reasonable mind would consider sufficient to justify the deduction of 3.74% from the base replacement cost provided in the report, notwithstanding the contrary testimony and evidence. See *Black*, 195 Mich App at 30.

The Township and County further argue that there was no evidence that the MISO switchyard actually cost $41 million, and that there was evidence that suggested that it had a much lower original cost. That argument is inapposite. Testimony made it clear that the 3.74% was applied to the baseline replacement cost of a new plant as a way to calculate the amount included within the total cost that reflected the costs of a new switchyard. That is, the deduction did not reflect the value of the actual MISO switchyard.

They similarly complain that New Covert Generating never disclosed how much it cost to build the MISO switchyard. The cost to build a specific switchyard at some point long before the valuation date was, however, not relevant to determining the amount of costs relating to a switchyard that were included in the Energy Information Administration's cost estimate in the 2016 Annual Energy Outlook report. Because the cost of the original switchyard was irrelevant to determining how much of the cost estimate for a new plant reflected the cost of a new switchyard, the Tax Tribunal had no obligation to discuss the MISO switchyard's value or justify the apparent difference between that value and the calculated value of a new switchyard that was included in the cost estimate for a new plant. See MCL 205.751(1); *Oldenburg v Dryden Twp*, 198 Mich App 696, 699-700; 499 NW2d 416 (1993) (stating that the Tax Tribunal's concise statement of facts and determinations of law need only be sufficient to facilitate meaningful appellate review).

The Township and County presented testimony and evidence to undermine the view that the cost of a new plant estimated in the 2016 Report included approximately $41 million in costs associated with the construction of a new switchyard. That being said, the expert adequately explained the basis of his opinion, and there was underlying evidence from the reports to support his testimony. As such, the dispute was a matter of the weight and credibility of the evidence, which was for the Tax Tribunal to resolve. *Black*, 195 Mich App at 30.

There was competent, material, and substantial evidence to support the Tax Tribunal's resolution of the amount of any adjustment to the baseline estimated replacement cost for a new plant to reflect the fact that the existing plant did not include a switchyard. Therefore, it did not commit an error of law by resolving that dispute in New Covert Generating's favor. See *Mich Props*, 491 Mich at 527-528.

## B. INTANGIBLES

Michigan's Constitution provides that the Legislature must provide for the taxation of only real property and tangible personal property. See Const 1963, art 9, § 3. As such, to the extent the valuations at issue included value for intangible assets that were not a value-influencing factor that had to be accounted for in calculating the value of tangible property, see *Meadowlanes Ltd Dividend Housing Ass'n v Holland*, 437 Mich 473, 495-496; 473 NW2d 636 (1991), it was proper to reduce those values by the amount attributable to the intangible assets. Here, the Tax Tribunal accepted Duff & Phelps's contention that it was reasonable to reduce New Covert Generating's value by 3% for the approximate value of its intangibles. The Tax Tribunal explained that there was evidence of substantial intangible assets, such as the service contract and Mitsubishi warranty, customized software, emission permits, fuel supply contracts, and the interconnection agreement.

The Township and County argue that there was no evidentiary support for a 3% reduction for intangibles. More specifically, they state that there was no evidence for specific intangibles that were applicable to New Covert Generating, and no study to support the use of a generic 3% estimate. They also contend that the Tax Tribunal accepted New Covert Generating's deductions for expenses related to the intangibles when calculating the value using the income approach and then deducted 3% for the value of the intangibles, which resulted in a double deduction.

As the Township and County correctly note, two experts testified that New Covert Generating did not have intangibles that warranted a deduction. However, one of those experts also agreed that power plants typically have intangibles, that the most important intangibles for power plants involved contracts, and that 3% was a standard figure (though commonly applicable to a business that owned multiple plants).

Although there was testimony admitting that New Covert Generating had a trained workforce in place, the undisputed evidence showed that New Covert Generating outsourced its management and operations to other entities, and had no employees of its own. Similarly, while there was testimony that it did not matter that the workforce belonged to another entity, there was no basis for valuing that workforce's training and experience as an intangible asset of New Covert Generating because New Covert Generating had no ability to control the workforce beyond the terms of the agreement with the employees' employer. That is, any value arising from the workforce was derived from the agreement that New Covert Generating had with the employees'

employer. The same is true for the other intangible assets that might be owned by the entities with which New Covert Generating contracted to operate its plant. Nevertheless, there was evidence that New Covert Generating had intangible assets in the form of such contracts. There was also evidence that those contracts would have some value. Indeed, one expert used the long-term service agreement with Mitsubishi to estimate New Covert Generating's future maintenance expenses, and rejected a sales comparison approach to valuing New Covert Generating on the ground that power plants were unique, and that the value of a power plant could be affected by undisclosed data, such as the value of undisclosed contracts. Similarly, another expert agreed that New Covert Generating had a long-term service agreement with warranties that had some value. Additionally, there was evidence that New Covert Generating had other valuable contracts and permits of which the value should be excluded.

The Township and County claim that the Tax Tribunal erred by accepting Duff & Phelps's deduction of the expenses associated with maintaining the intangible assets while at the same time deducting the value of those assets. The two concepts are distinct, as New Covert Generating explains on appeal. The expenses associated with maintaining an asset are expenses that reduce net income, which necessarily affects a valuation premised on income. But those expenses are distinct from the value of the asset itself, and the expenses do not implicate whether the value of the asset is subject to taxation. As such, it did not amount to an error of law or the adoption of a wrong principle to deduct the value of nontaxable assets even though the expenses associated with the maintenance of those assets were deducted under the income approach to valuation. *Mich Props*, 491 Mich at 527-528.

In sum, expert testimony confirmed that power plants like New Covert Generating frequently have valuable intangible assets in the form of contractual rights, and that 3% of total value was a commonly used estimate for the value of the intangible property. Given the testimony and evidence that New Covert Generating owned valuable contract rights, a reasonable person could conclude that some value should be deducted to reflect the value of the intangible property that was not subject to taxation. See *Black*, 195 Mich App at 30. And whether the general figure should be modified on the specific facts applicable to New Covert Generating was a matter of the evidence's weight and credibility to be resolved by the Tax Tribunal, which this Court will not second guess on appeal. See *id*. That testimony, when considered in light of the evidence concerning Duff & Phelps's experience and the other testimony and evidence, constituted competent, material, and substantial evidence to support a finding that 3% of New Covert Generating's value could be attributed to its intangible assets. *Mich Props*, 491 Mich at 527-528.

C. WORKING CAPITAL

The Township and County also argue that the Tax Tribunal erred when it accepted Duff & Phelps's deduction for working capital, asserting that the evidence showed that New Covert Generating did not need significant working capital because PJM paid New Covert Generating on a weekly or bimonthly basis, which was adequate to cover New Covert Generating's monthly operating expenses.

The expert testimony offered by the Township and County suggested that New Covert Generating might not need substantial working capital because its revenue stream was adequate to finance its needs. But they did not relate their opinions to all the expenses that New Covert

Generating might have had—such as its labor costs, management costs, or costs arising from contractual agreements. Moreover, the testimony of a New Covert Generating expert was adequate to establish that the generally applicable estimate of working capital accurately modeled New Covert Generating's actual working capital needs. Because there was competent evidence to support either position, it was for the Tax Tribunal to resolve the conflicting evidence, and this Court cannot substitute its judgment for that of the Tax Tribunal. *Black*, 195 Mich App at 30. The Tax Tribunal did not commit an error of law when it accepted Duff & Phelps's handling of this disputed calculation. *Mich Props*, 491 Mich at 527-528.

## D. COST TO FINANCE

The Tax Tribunal's decision to accept Duff & Phelps's estimate for the cost to finance a new construction project was also supported by competent, material, and substantial evidence on the whole record. In accepting an incredibly low rate of 1.02%, they maintain, the Tax Tribunal also mischaracterized the rate that Concentric actually applied as 12%.

As discussed, the parties relied on Annual Energy Outlook reports by the Energy Information Administration when calculating the base cost for a new plant. Those reports state the "overnight cost" of a plant, which is the estimate of all the costs for everything that one would need to build a plant on the day of valuation. The overnight cost, according to one expert, did not include the expenses associated with the actual construction, such as the expenses related to financing the project. Accordingly, the parties agreed that the base cost for a new plant should be adjusted to reflect the costs associated with the financing for the project.

Duff & Phelps viewed the cost a bit differently for purposes of the valuation; it chose to determine the cost by looking at the owner's lost opportunity to invest the amount needed to develop the new plant in a long-term interest rate vehicle. It calculated the lost interest over the development period to be $16 million on an investment of a "billion 92 million."

By contrast, an expert for the Township and County assumed that a typical developer would finance 38% of the project with equity and the remaining percentage with construction loans, and calculated the total cost to finance the approximately $690 million expense over a construction term of three years using interest rates that began at 7.23% and gradually rose to 7.86%. The total cost under that approach amounted to more than $62 million. Because the hypothetical owner of the new plant developed the plant in part using equity, the cost was increased by the owner's expected profit.

The Tax Tribunal accepted Duff & Phelps's treatment of the cost to finance as the more reasonable approach. In explaining its reasoning, the Tax Tribunal stated that Concentric placed the interest rate at 12%, which was not the actual rate assigned in Concentric's appraisal. The Tax Tribunal rejected that rate, not only because it felt that the rate was unreasonable, but also because a market-based interest rate was highly variable and depended in significant measure on who the developer was, rather than the nature of the property itself. As such, the Tax Tribunal determined, application of a market rate would run afoul of the doctrine of uniformity in taxation.

Additionally, the Tax Tribunal indicated in its opinion denying reconsideration that the reference to 12% interest did not warrant any relief because it had properly rejected the application of a market rate as violative of the doctrine that taxation should be uniform.

The Tax Tribunal did not err when it rejected the market rate approach to calculating the costs associated with financing the development of a new plant. As the evidence showed, there were many different debt instruments available to finance a new project. Yet, in assessing the value of property, the Tax Tribunal had to ensure that valuation method ensured uniformity in taxation, but a valuation that varied significantly on the basis of an interest rate calculation would violate that requirement. See *Meadowlanes*, 437 Mich at 493. The approach taken by Duff & Phelps avoided the problem of varying interest rates by assuming that the developer could finance the entire project with equity, and then measuring the expense by calculating the lost revenue from investment in a treasury bond. The Tax Tribunal found that Duff & Phelps's approach better conformed to the uniformity requirement and resulted in a more reasonable approximation of the base cost for a new plant. Because there was testimony supporting that proposition that was adequate to permit a reasonable mind to find that the $16 million cost adjustment accurately represented the cost to finance, the Tax Tribunal did not commit an error of law when it adopted that approach. *Black*, 195 Mich App at 30.

## E. PLANT EFFICIENCY AND FUEL COSTS

The Township and County finally argue that the Tax Tribunal adopted a wrong principle when it accepted Duff & Phelps's heat rate for a new plant that used a turbine that did not exist on the valuation date and which did not reflect real working conditions.

The Tax Tribunal determined that, of the two Annual Energy Outlook reports that the parties used to calculate the base cost of a new plant, Duff & Phelps's use of the 2016 report reflected a more accurate assessment of the cost of a new plant on the valuation date of December 31, 2015. The Tax Tribunal reasoned that the information contained in the 2016 report was relevant, even though issued some months after the valuation date, and better reflected the technology available in 2015.

The Tax Tribunal's rationale was adequate to justify its decision to accept Duff & Phelps's use of the 2016 report. The 2013 report reflected data for a new plant that was available in 2012—it did not reflect the advancements that occurred in the years since. Further, there was testimony that the data reflected in the 2016 report was collected in 2015. Therefore, even though the report itself did not get released until 2016, the underlying data could have been collected by a hypothetical developer and used to calculate the cost of a new plant for purposes of valuing an existing plant on December 31, 2015. Moreover, even though the report was not released until some months after the valuation date, as the Tax Tribunal properly recognized, that fact did not make the report irrelevant. Rather, it was a factor to consider in assigning the weight afforded to the information contained in the report. *Jones & Laughlin Steel Corp v Warren*, 193 Mich App 348, 354; 483 NW2d 416 (1992).

The Township and County attempt to distinguish *Jones & Laughlin* on the basis that the data at issue there involved an actual sale, not a report that discussed a technology that was not in existence. The attempt is unavailing, as the *Jones & Laughlin* Court held that evidence is not

automatically rendered irrelevant because the evidence involved events occurring after the valuation date. *Id*. at 354. Under that holding, the Tax Tribunal did not commit an error of law when it determined that the data from that report was relevant to the findings of fact necessary to calculate the replacement cost of New Covert Generating's plant on December 31, 2015. MRE 401; MRE 402. Indeed, the Tax Tribunal determined that the data from the 2016 report better reflected the costs and heat rate for a plant on December 31, 2015, than did the 2013 report, which necessarily reflected technology that was several years out of date by the valuation date. As such, the Tax Tribunal's finding that the 2016 report was more credible and worthier of greater weight was supported by competent, material, and substantial evidence. *Black*, 195 Mich App at 30. Similarly, whether there should be additional modifications to the data reflected in the report to better reflect real-world operating conditions was a matter of the weight and credibility of the data related in the report, which was within the province of the Tax Tribunal to resolve. *Id*. The Tax Tribunal did not commit an error of law or adopt a wrong principle in its handling of the 2016 report. *Mich Props*, 491 Mich at 527-528.

## F. OWNER'S PROFIT

On cross-appeal, New Covert Generating argues that the Tax Tribunal erred by including in the cost of a new plant an amount attributable to the owner's profit. It maintains that, in *Meijer, Inc v Midland*, 240 Mich App 1; 610 NW2d 242 (2000), this Court held that owner's profit would be applicable only under circumstances when the property was developed to make a profit from sale and there was evidence that the market price would bear inclusion of the owner's profit. New Covert Generating argues that the Tax Tribunal erred by failing to consider these factors and erred because there was no evidentiary support for them. Finally, it argues that there was no evidentiary support for the 5% figure actually selected for owner's profit.

In *Meijer*, we analyzed whether the Tax Tribunal erred when it accepted a valuation that added "five percent for entrepreneurial profit" to the cost approach for valuing a property, *id*. at 8, agreeing with foreign authorities that the "true cash value of developed real estate may not always be reflected by the cost of the project without the inclusion of entrepreneurial profit." *Id*. at 10. The Court stated that the Tax Tribunal, however, could not mechanically include an entrepreneurial or owner's profit, and it warned that determining when it was proper to include owner's profit in the cost calculation might be difficult. *Id*. Thus, we held that an owner's profit may be included where a developer might develop the property in order to profit from its sale, *id*. at 11, but there must be "some evidence upon which one can support the conclusion that the market would bear the inclusion of entrepreneurial profit," or the inclusion of such profit would amount to pure speculation. *Id*. at 12. Because there was no evidence that a developer would develop a 180,000-square-foot retail building for profit, the Tax Tribunal had erred by including a 5% owner's profit. *Id*. at 13.

Here, although the Tax Tribunal adopted Duff & Phelps's approach to valuation using the cost approach, it determined that that approach was flawed to the extent that it did not include "owner's profit" because "no one would build a plant for free." The Tax Tribunal accepted Concentric's included owner's profit of $53,853,870. When New Covert Generating challenged this decision in its motion for reconsideration, the Tax Tribunal clarified that entrepreneurial incentives were appropriate because the property was specifically developed as a merchant

generator operating in the private market. For that reason, it concluded that the plant was intended to earn a return on its owner's investment.

Although it may be true generally that regulated utilities do not develop property for profit from sale, that is not necessarily the case for the development of a merchant generator. Rather, as the parties' experts related, a merchant generator competes in the market and hopes to profit from the sale of electricity. And a developer may develop a merchant generator with the expectation to sell it for a profit to an entity that specializes in the energy market, or to transfer it to a related company to serve as part of its energy portfolio. Indeed, there was evidence in the record that supported an inference that New Covert Generating was acquired, marketed, and transferred for profit, which included an effort to profit from the sale of the plant.

Duff & Phelps calculated the replacement cost by first determining the cost to develop a new and state-of-the art plant with a similar nameplate capacity, and chose not to increase the cost of development by the cost to finance some or all of the project, which impliedly meant that its appraisal involved a hypothetical developer who financed the project with its own resources. Duff & Phelps assumed that the developer's only cost beyond the investment of more than $1 billion in the project itself would be the lost opportunity to invest the $1 billion in treasury bonds. However, it is reasonable to assume that a developer with more than $1 billion to invest would likely not choose to invest in the development of a for-profit merchant generator if it could not realize a profit greater than the interest that it might receive from investing its $1 billion in treasury bonds. Accordingly, under the development model advanced by Duff & Phelps, an accurate baseline cost should include some profit beyond the lost opportunity to invest.

Both the Tax Tribunal and the New Jersey Tax Court have recognized that entrepreneurial profit must be included when calculating the cost of a new development under like conditions: " 'When the direct and indirect costs of developing a property are used to provide an indication of value, the appraiser must also include an economic reward sufficient to induce an entrepreneur to incur the risk associated with a building project.' " *Metuchen I, LLC v Borough of Metuchen*, 21 NJ Tax 283, 292 (2004),[8] quoting American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 360 (12th ed 2001). The court in *Metuchen I* further observed:

> Entrepreneurial profit is compensation for risk and expertise associated with development. Therefore, a realistic cost approach must recognize adequate compensation to the entrepreneur to induce him to organize the project. It is necessary to include a figure which reflects the time, effort, and incidental expense of the owner in the development of the property. [*Metuchen I*, 21 NJ Tax at 292 (citations omitted).]

Accordingly, there was record support for the Tax Tribunal's decision to include entrepreneurial profit in the base cost of the cost to develop a new power plant. See *Meijer*, 240 Mich App at 11.

---

[8] "Cases from other jurisdictions are not binding precedent, but we may consider them to the extent this Court finds their legal reasoning persuasive." *Auto Owners Ins Co v Seils*, 310 Mich App 132, 147 n 5; 871 NW2d 530 (2015).

The Tax Tribunal accepted Concentric's assessment of the cost of equity that an investor would expect to receive for developing a merchant electric-generator. In doing so, it impliedly adopted Concentric's underlying rationale and data, which it could do to satisfy its duty to state the facts consistent with MCL 205.751(1). See, e.g., *Consol Aluminum Corp v Dep't of Treasury*, 206 Mich App 222, 238; 521 NW2d 19 (1994) (stating that the Tax Tribunal may adopt findings and conclusions of law by reference, and, when it does, it need only make separate findings and conclusions with regard to those areas with which it disagrees with the adopted rationale). Although Duff & Phelps presented testimony to undermine Concentric's position regarding the inclusion of owner's profit, expert testimony and Concentric's appraisal were sufficient—notwithstanding the contrary evidence—to permit a reasonable mind to find that the base cost of a new plant should include the costs associated with the equity investors' expected return, and that a reasonably approximate proxy group would expect a return of about 5%. See *Black*, 195 Mich App at 30. Therefore, because there was competent, material, and substantial evidence to support its findings and conclusions, the Tax Tribunal did not commit an error of law when it included owner's profit in the cost of a new plant. *Mich Props*, 491 Mich at 527-528.

## G. SEGRETO SWITCHYARD

Finally, New Covert Generating argues that the Tax Tribunal erred in its treatment of the expenses associated with the construction of the Segreto switchyard. It maintains that the Tax Tribunal itself recognized that New Covert Generating had to spend at least an additional $12 million to complete the project, but did not reduce the cost to reflect that obligation, even though a prospective buyer would take that expense into consideration. New Covert Generating further argues that the Tax Tribunal should have deducted the full $58,915,530 because that expenditure was necessary to ensure that the property was fit for its highest and best use.

On appeal, New Covert Generating makes much of the fact that a purchaser would normally account for the costs that it would have to pay after purchasing the plant in order to operate at its highest and best use. But the testimony and evidence supported a finding that the costs associated with the PJM Interconnection, which included the Segreto switchyard, had already been paid by the valuation date. As such, there was evidence that a purchaser would not have to account for the costs when purchasing the plant. Rather, the purchaser would value the plant on the basis of the completed interconnection project. New Covert Generating's mere disagreement with the Tax Tribunal's findings does not establish that the Tax Tribunal committed an error of law or adopted a wrong principle. *Black*, 195 Mich App at 30.

New Covert Generating also concludes that the Tax Tribunal must have erred in its findings because the Tax Tribunal admitted as much on reconsideration. In its opinion and judgment, the Tax Tribunal found that the costs associated with the Segreto switchyard had already been paid before the valuation date and, for that reason, should not be deducted from the valuation of New Covert Generating. A different judge reviewed the motions for reconsideration, and opined that the first judge erred by making that finding because the evidence showed that additional amounts would be due in 2016. However, that judge did not have the opportunity to hear the witnesses and assess their credibility. That judge also did not acknowledge that the report that purportedly established the costs associated with the interconnection project was a cost estimate prepared some years earlier and did not involve actual data. Given the lack of evidence that New Covert Generating had actual obligations arising from the construction of the Segreto switchyard after the

valuation date, the original judge could properly find that the obligations had been paid before the valuation date and, on that basis, could determine that it was inappropriate to value New Covert Generating by deducting expenses already paid, or on the assumption that it would have future expenses related to another entity's property. On this record, there was competent, material, and substantial evidence to support the Tax Tribunal's decision to exclude any deductions for costs associated with the Segreto switchyard. Consequently, the Tax Tribunal did not commit an error of law when it chose not to deduct any amount from the value of New Covert Generating on the basis of the interconnection project. *Mich Props*, 491 Mich at 527-528.

## VII. SANCTIONS

The Township and County have not shown that the Tax Tribunal erred when it determined that the filing of the motions at issue warranted sanctions.

Although this Court's review of a Tax Tribunal's findings of fact and application of law is generally quite limited, those limitations apply only to decisions relating to valuation or allocation of taxes, see Const 1963, art 6, § 28, which is not at issue for an order of sanctions. This Court reviews de novo whether the Tax Tribunal properly interpreted and applied the court rules, and the Tax Tribunal's findings underlying its application of the court rules for clear error. See *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 387; 761 NW2d 353 (2008). A finding is clearly erroneous when, on review of the whole record, this Court is left with the definite and firm conviction that the Tax Tribunal made a mistake. *Id*.

The Legislature has authorized the Tax Tribunal to issue any order that it deems necessary or appropriate in the process of disposition of a matter over which it has jurisdiction. MCL 205.732(c). Additionally, the Tax Tribunal has promulgated its own rules, and Rule 215 provides that the Michigan Court Rules apply in the absence of an applicable tribunal rule. Rule 792.10215. The Tax Tribunal has not promulgated specific rules governing sanctions for filing frivolous documents, so the court rules apply to the Tax Tribunal's decision.

The Tax Tribunal sanctioned the Township, County, and counsel under what was then MCR 2.114(D), which has since been relocated to MCR 1.109(E).[9] The court rules provide that, by signing a document filed with the court, the signer certifies that, "to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law[,]" MCR 1.109(E)(5)(b), and that he or she has not interposed the document "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation[,]" MCR 1.109(E)(5)(c). If a signatory signs a document in violation of the rule, the court "shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees." MCR 1.109(E)(6).

---

[9] Because the substantive provisions are the same, we will cite to the current court rule.

"An attorney has an affirmative duty to conduct a reasonable inquiry into the factual and legal viability of a pleading before it is signed." *LaRose Market, Inc v Sylvan Ctr, Inc*, 209 Mich App 201, 210; 530 NW2d 505 (1995). "The reasonableness of the attorney's inquiry is determined by an objective standard, not the attorney's subjective good faith." *Meisner Law Group, PC v Weston Downs Condo Ass'n*, 321 Mich App 702, 731; 909 NW2d 890 (2017). "A court must determine whether a claim or defense is frivolous on the basis of the circumstances at the time it was asserted." *Id*. at 732. "[A] claim is devoid of arguable legal merit if it is not sufficiently grounded in law or fact, such as when it violates basic, longstanding, and unmistakably evident precedent." *Adamo Demolition Co v Dep't of Treasury*, 303 Mich App 356, 369; 844 NW2d 143 (2013) (quotation marks and citations omitted).

The Township and County filed two motions that the Tax Tribunal determined warranted sanctions. They filed a motion for summary disposition in October 2017, concerning New Covert Generating's status as a party in interest, and they filed a motion for summary disposition in June 2018, arguing that the Tax Tribunal lacked jurisdiction because New Covert Generating had not filed statements of personal property.

In its brief in support of its motion for summary disposition involving whether New Covert Generating was a party in interest, the Township and County acknowledged the decision in *Spartan Stores*, 307 Mich App 565, but argued that that case had not involved a shell corporation. They also noted that the *Spartan Stores* Court had stated that the separate existence of an entity could be disregarded. The Township and County indicated that all of the elements necessary to disregard New Covert Generating's separate existence were present, and that the Legislature did not intend to allow shell companies to invoke the Tax Tribunal's jurisdiction. Both parties asked the Tax Tribunal to dismiss New Covert Generating's petitions for lack of jurisdiction.

Although the Township and County mentioned the decision in *Spartan Stores*, they did not discuss it in any meaningful way. Moreover, they ignored the actual holdings in *Spartan Stores*— this Court expanded the concept of party in interest to include not only the actual owner of the property assessed, but also any entity that held an interest in the property. See *Spartan Stores*, 307 Mich App at 575-576. The Township and County also ignored the fact that the *Spartan Stores* Court held that Spartan was not a party in interest because it indirectly owned the entity that owned the leasehold interest, Family Fare, which was insufficient to establish an interest in the property because courts must generally respect the separate existence of artificial entities. *Id*. at 577 n 13.

The Township and County also did not examine the actual language of the statute, and did not identify the terms that demonstrated that the statute actually barred so-called "shell" companies from being a party in interest. Rather, they appeared to argue that the Tax Tribunal should treat the record owner of the property assessed as though it were not a party in interest—even though caselaw clearly established that it was a party in interest—because New Covert Generating was an asset-holding entity that used other entities to run its day-to-day operations, which made discovery complicated. Notably, the Township and County did not sue to have New Covert Generating's separate existence disregarded. Indeed, they did not even address whether the Tax Tribunal had the authority to disregard New Covert Generating's separate existence. See *Electronic Data Sys Corp v Flint Twp*, 253 Mich App 538, 548; 656 NW2d 215 (2002) (stating that the Tax Tribunal does not have equitable powers).

Examining the actual arguments made in their motion for summary disposition premised on MCL 205.735a(6), there was no basis in fact or law for the motion. Because it is well settled that courts respect the separate existence of an artificial entity except in certain exceptional cases, the Tax Tribunal had no choice but to respect New Covert Generating's separate existence. See *Green*, 310 Mich App at 450-451. Additionally, the Court in *Spartan Stores* held that an entity— such as New Covert Generating—with an interest in the property assessed was a party in interest. See *Spartan Stores*, 307 Mich App at 575-576. Consequently, the Township and County's motion for summary disposition was not well grounded in fact or law, and there was nothing in the motion to suggest that the Township and County were urging a good-faith extension, modification, or reversal of the existing law. See MCR 1.109(E)(5)(b). Indeed, the Tax Tribunal aptly characterized the motion as arising from discovery disputes that it had addressed and would continue to address, if necessary. The Tax Tribunal also did not err when it determined that the Township and County essentially ignored the holding in *Spartan Stores*. The Tax Tribunal recognized that the Township and County did not explain how the title owner of the property assessed could ever be found not to be a party in interest. Because the Township and County's motion premised on New Covert Generating's status as a party in interest was not well grounded in fact or law, the Tax Tribunal had to apply an appropriate sanction for the filing of the October 2017 motion. See MCR 1.109(E)(6).

In their June 2018 motion for summary disposition premised on jurisdiction, the Township and County argued—as they had in the previous litigation—that a taxpayer could not invoke the Tax Tribunal's jurisdiction without first filing statements of assessable property. They maintained that New Covert Generating had to file Forms L4175, 3991, and 4094, as promulgated by the State Tax Commission. They acknowledged that New Covert Generating had filed all three forms, even if under protest, but maintained that the filings did not comply with the instructions for completing the forms. They then argued that the filings were inadequate to meet what they believed was required under MCL 205.735a(4)(b) to invoke the Tax Tribunal's jurisdiction.

The Tax Tribunal relied on this Court's decision in the appeal involving the petitions from 2010 and 2011, and concluded that New Covert Generating did not have to file statements of assessable property before directly appealing to the Tax Tribunal because it was undisputed that New Covert Generating had protested the tax years at issue before the Board. The Tax Tribunal also noted that this Court had stated that the only form that New Covert Generating had to file was Form 4175, which it did. Accordingly, it denied the motion.

The Township and County's preferred construction—although implausible, as discussed above—was not so implausible that counsel could not advocate for that position without running afoul of MCR 1.109(D). Therefore, the Tax Tribunal erred to the extent that it determined that the motion was not well grounded in fact or law. To the extent that the Tax Tribunal relied on counsel's purportedly inconsistent positions in different cases involving different parties, that too was error. Counsel had every right to advance the lawful objectives of his clients by every reasonably available means permitted by law, even if that position was inconsistent with the position that counsel advanced on behalf of a different client. See MRPC 1.2(a). Therefore, the trial court clearly erred when it determined that the filing of the June 2018 motion for summary disposition was not well grounded in fact or law. Nevertheless, that was not the only basis for the Tax Tribunal's decision to impose sanctions.

In determining that sanctions were warranted, the Tax Tribunal initially stated that the timing of the June 2018 motion just before the July 2018 contested hearing raised the issue as to whether it was filed for an improper purpose, such as to delay or harass New Covert Generating. It also indicated that the motion might be frivolous given this Court's previous decision in the prior appeal. However, the Tax Tribunal withheld resolution of those issues.

In its opinion applicable to tax year 2016, the Tax Tribunal provided a further rationale for its decision to sanction the Township and County for the motions for summary disposition filed in October 2017 and June 2018. It first discussed the motion filed in October 2017, and considered the manner by which counsel for the County conducted the litigation, and noted that counsel had filed what was in effect six motions for summary disposition in addition to requests for leave to appeal. It further wrote that counsel had used motions for immediate consideration in a way that compelled New Covert Generating to respond within seven days. The Tax Tribunal also cited counsel's conduct in other litigation, which suggested that counsel was familiar with the holding in *Spartan Stores*, and stated that counsel used allegations of fact and innuendo to cast New Covert Generating in a bad light. The Tax Tribunal found that the purpose of the motion was to "poison the well at [the] hearing, rather than to win on the merits of the motion."

With regard to the motion filed in June 2018, the Tax Tribunal determined that that motion was also frivolous, and further found that it was "imposed for an improper purpose." The Tax Tribunal reiterated these determinations and findings for the order applicable to tax years 2012 through 2015. Finally, on reconsideration, the Tax Tribunal stated in relevant part that the Township and County could not reasonably cite the discovery disputes as justification for the motions because the Tax Tribunal had resolved the discovery disputes. Additionally, the Tax Tribunal again cited counsel's positions in other litigation regarding the holding in *Spartan Stores* as evidence that counsel's purpose for filing the motion was improper.

Based on the entire record, the Tax Tribunal's findings for both motions were not clearly erroneous. The Township and County had been involved in long, ongoing and contentious tax disputes with New Covert Generating. As the Tax Tribunal noted, the Township and County filed three motions for summary disposition in each of the tax appeals, even though it subsequently withdrew one. When the timing is considered in relation to the stage of the dispute, the discovery battles, and the date scheduled for the contested hearing, the Tax Tribunal could reasonably conclude that the motions were filed for ulterior motives: namely, to poison the well before the hearing, harass New Covert Generating, and increase the cost of litigating the valuation dispute. The Tax Tribunal was familiar with the present litigation, the past litigation, the parties, and their counsel. As such, it was in the best position to assess the credibility and motivation of the parties and counsel. See MCR 2.613(C). MCR 1.109(E)(5) provides that the effect of a signature on a document represents that the signer read the document, it was well grounded in fact and law, "*and*" it was not filed for an improper purpose. Therefore, although the Tax Tribunal clearly erred in determining that the June 2018 motion for summary disposition was not well grounded in fact and law, it could still properly impose sanctions based on its finding that the motion was filed for an improper purpose. On this record, the Court is not left with the definite and firm conviction that the Tax Tribunal clearly erred in its findings. See *Johnson Family Ltd Partnership*, 281 Mich App at 387.

Once the Tax Tribunal found that counsel filed the motions for an improper purpose, it had to impose an appropriate sanction, even if the motion was otherwise well grounded in fact and law. See MCR 1.109(E)(6). Moreover, the Township and County have not challenged the propriety of the actual sanctions or the amount of the sanction. As such, they have not identified a basis for reversing the Tax Tribunal's orders imposing sanctions.

Affirmed.

/s/ Christopher M. Murray
/s/ Mark J. Cavanagh
/s/ Brock A. Swartzle